1

*BONNETT, FAIRBOURN, FRIEDMAN*
*& BALINT, P.C.*
*2901 North Central, Suite 1000*
*Phoenix, AZ 85012*

2

3

4

*William G. Fairbourn (AZ Bar #003399)*
*Meredith L. Vivona  (AZ Bar #023515)*

5

6

*(Additional counsel appear on signature page)*

7

*Attorneys for DEFENDANT*

8

## UNITED STATES DISTRICT COURT

9

## DISTRICT OF ARIZONA

10

11

COMPUTER DYNAMICS, INC.,
an Arizona corporation,

CASE NO.:  CV06-2748-PHX-HRH

12

**DEFENDANT'S ANSWER TO
COMPLAINT AND COUNTERCLAIM
AGAINST PLAINTIFF**

Plaintiff,

13

vs.

14

STELLA NOVA TECHNOLOGIES, INC.,
a North Carolina corporation,

**(JURY TRIAL DEMANDED)**

15

16

Defendant.

17

18

For its Answer to the Complaint, Defendant Stella Nova Technologies, Inc., ("SNT"), by

19

its attorneys, Wyrick Robbins Yates & Ponton LLP and Bonnett Fairbourn Friedman & Balint,

20

P.C., in numbered paragraphs which correspond to the paragraph numbers contained in the

21

22

Complaint, alleges, states, and avers as follows:

23

### Introduction

24

This case involves two small corporations that were unable to agree on how to form a

25

jointly-owned third LLC or other joint venture in which to develop new point-of-sale software

26

products for retailers. Their goal was to work towards forming a third LLC or other joint venture

27

28

while retaining ownership of their separate companies and products. They never agreed to merge into one entity, contrary to the assertions by Plaintiff Computer Dynamics, Inc. ("CDI").

During the summer of 2005, Mr. Ed Conklin ("Conklin"), an intermediary who worked with both companies in his job at Fujitsu Transaction Solutions, Inc., introduced officers of the two companies, believing that they (and perhaps other companies) could possibly form a third LLC or other joint venture, owned by each corporation, in which to collaborate and develop new products. Conklin even prepared a draft business plan showing a third, jointly-owned LLC, with possible additional investors, as opposed to a merger of the two companies.

During the initial discussions, CDI misrepresented itself to SNT, including its size (leading SNT to believe it had approximately 25 employees), use of its products in the marketplace, and technical expertise. Once SNT learned of the misrepresentations, it had already invested substantial time and assets trying to make a proposed third LLC or other joint venture become a reality, and it tried diligently to find a way to form a third LLC or other joint venture with terms agreeable to both parties.

Throughout the entire course of dealings, SNT provided valuable information, technical assistance, and even training to CDI. SNT invested many months of numerous person-hours, intellectual property and expertise into the potential project, from which CDI has separately and directly benefited. SNT devoted much of its key technical employees' valuable time, which SNT has documented, and assets away from its current successful business and other potential new opportunities to try to form a third jointly owned company or other joint venture with CDI, which would develop new products while CDI and SNT retained ownership of their respective existing products. Instead of recognizing the value added to it by SNT, CDI has mischaracterized the goal to which the two companies were striving and the contributions of the two companies.

Additionally, both parties agreed that they each would pay for their own efforts towards possibly forming a third LLC or other joint venture, including the expenses of their own employees incurred in trying to develop product(s) for the possible venture. Also, both parties recognized that if they were able to agree to and create such a venture, the first year or so of it would likely not be profitable. In fact, the overall profitability of any venture possibly reached was speculative at best.

There was no contractually enforceable agreement between SNT and CDI. SNT worked towards trying to create a third LLC or other joint venture, but CDI's principal terminated that effort after SNT had provided value to CDI. If there is any entitlement to money damages here, SNT is entitled to damages from CDI for the value SNT added to CDI.

In attempting to respond to the specific paragraphs of the Complaint, those paragraphs contain a large amount of hyperbole. Also, some of them are apparent attempts by CDI to confuse the sophisticated software of other companies, such as Fujitsu, with its own and/or implicitly claim other companies' intellectual property as its own. Further, there are numerous compound allegations and conclusory arguments throughout the Complaint. Additionally, CDI's Complaint occasionally takes shreds of actual fact and adds incorrect conclusions and/or opinions to make the resulting allegation inaccurate, and it takes actual facts out of context.

In light of the: (1) hyperbole; (2) compound allegations; (3) multiple allegations contained in a number of the lengthy paragraphs in the Complaint; (4) legal conclusions; and, (5) overall misleading nature of the Complaint, and additionally out of an abundance of caution, SNT hereby gives notice that, except as expressly admitted below, SNT denies all allegations contained in the Complaint, including all compound and other allegations that can be construed to admit liability against it. Relying upon that preface, SNT responds to the specific paragraphs of the Complaint as follows:

3

1.    Admitted upon information and belief.

2.    Admitted.

3.    Denied.

4.    The allegations of Paragraph 4 state a legal conclusion to which no response is required.

5.    Upon information and belief, SNT admits that CDI is headquartered in Scottsdale, Arizona. SNT has insufficient knowledge or information to form a belief as to the truth of the allegation regarding when CDI was established, and accordingly denies that allegation. SNT denies the remaining allegations contained in Paragraph 5.

6.    The allegations contained in Paragraph 6 state legal conclusions to which no response is required. To the extent that there are facts contained in Paragraph 6 that are deemed to require a response, SNT has insufficient knowledge or information to form a belief as to the truth of said allegations, and accordingly denies them.

7.    The allegations contained in the first sentence of Paragraph 7 state legal conclusions to which no response is required. To the extent that there are facts contained in the first sentence of Paragraph 7 that are deemed to require a response, SNT admits that Fijitsu collaborates with various retailing companies, but SNT has insufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in that sentence, and accordingly denies them. SNT denies the remaining allegations contained in Paragraph 7.

8.    Upon information and belief, SNT admits that CDI works with (to an unknown degree) Hypercom Corporation and that Hypercom is a global provider of electronic payment solutions for merchants and customers. SNT also admits that Hypercom delivers card payment terminal, network access devise, server, and transaction networking solutions that assist merchants and financial institutions generate revenues and increase profits. SNT has insufficient

4

knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 8, and accordingly denies them.

9.      The allegations contained in Paragraph 9 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

10.      The allegations contained in Paragraph 10 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations. Additionally, to the extent that CDI is attempting to confuse its products with the capabilities of products manufactured by Fujitsu, SNT further objects.

11.      The allegations contained in Paragraph 11 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

12.      The allegations contained in Paragraph 12 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

13.      The allegations contained in Paragraph 13 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

14.      The allegations contained in Paragraph 14 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

15.      The allegations contained in Paragraph 15 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

16.     The allegations contained in Paragraph 16 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations. Additionally, SNT objects to the extent that CDI is attempting to claim that the capabilities of Fujitsu's products are its own. SNT additionally objects to the relevance of the allegations contained in Paragraph 16 because they concern Fujitsu and its product TeamPOS 2000.

17.     The allegations contained in Paragraph 17 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations. Additionally, SNT objects to the extent that CDI is attempting to claim that the capabilities of Fujitsu's products are its own. SNT additionally objects to the relevance of the allegations contained in Paragraph 17 because they concern Fujitsu and its product iPAD.

18.     The allegations contained in Paragraph 18 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations. Additionally, SNT objects to the extent that CDI is attempting to claim that the capabilities of Fujitsu's products are its own. SNT additionally objects to the relevance of the allegations contained in Paragraph 18 because they concern Fujitsu and its product TeamPOS 2000. SNT additionally states that it believes Fujitsu's hardware products are very good. However, it is concerned that CDI is attempting to confuse the products and intellectual property of Fujitsu with CDI's own products.

19.     SNT admits that it was incorporated in North Carolina by Larry Gibbs ("Gibbs"), David Hawkins ("Hawkins"), and Rathin Devchoudhury ("Devchoudhury") to develop POS applications, web applications, and other applications designed for the retail environment. The remaining allegations contained in Paragraph 19 state legal conclusions to which no response is required. Additionally, said allegations are compound and assume allegations to which SNT

denies. Therefore, to the extent that a response is deemed required, SNT denies said remaining allegations contained in Paragraph 19.

20.    SNT admits that CDI and SNT were introduced to each other by Indirect Sales Channel Manager for Fujitsu, Ed Conklin ("Conklin"), who was the Fujitsu Sales Representative for both CDI and SNT. Defendant has insufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 20, and accordingly denies them. Additionally, SNT states that CDI, through Hank Szopinski ("Szopinski"), represented to SNT that it had approximately 25 employees and gave the impression of a bigger sales staff than the two that it claims in Paragraph 20.

21.    SNT admits that Conklin had considerable knowledge of competitive products in the market and of the opportunities available in a sales and marketing environment. SNT additionally admits that during 2005, Conklin had a separate entity named Watchhill Technologies, which was engaged in various sales efforts and product development. Except as expressly admitted, SNT denies the allegations contained in Paragraph 21.

22.    SNT admits that on or about July 20, 2005, Conklin sent an email to Szopinski, Gibbs and Hawkins. Said email is capable of being printed, and therefore can be reduced to writing. Subject to authentication, it speaks for itself as to its contents. To the extent that CDI's allegations concerning said email are out of context, misleading, or otherwise differ from the statements contained in the email and/or to the extent that the email itself contains any incorrect statements, said allegations are denied.  SNT further expressly denies that said email concerned a possible merger. Except as expressly admitted, SNT denies the allegations contained in Paragraph 22.

23.    SNT admits that Szopinski came to North Carolina and left on or about August 17, 2005. SNT denies the remaining allegations contained in Paragraph 23.

7

24.     SNT admits that on or about August 26, 2005, Szopinski sent an email to Gibbs and Hawkins. Said email is capable of being printed, and therefore can be reduced to writing. Subject to authentication, it speaks for itself as to its contents. To the extent that CDI's allegations concerning said email are out of context, misleading, or otherwise differ from the statements contained in the email and/or to the extent that the email itself contains any incorrect statements, said allegations are denied. SNT further expressly denies that there was an understanding or agreement that CDI and SNT would work toward merging.

25.     SNT admits that on or about September 1, 2005, Hawkins sent an email to Szopinski, and shortly after said email was sent, Hawkins, Szopinski and Annie Rausa ("Rausa") had a conference call in which applications were discussed. Except as expressly admitted, SNT denies the allegations contained in Paragraph 25.

26.     SNT admits that CDI provided Hawkins with its Application Programming Interface, which is an industry standard for application communications, and a flow-chart illustration. Except as expressly admitted, SNT denies the allegations contained in Paragraph 26.

27.     SNT admits that on or about September 27, 2005, Szopinski traveled to North Carolina for a meeting(s) with Conklin, Gibbs, Hawkins, and Devchoudhury, and that Szopinski left on or about September 29, 2005. Except as expressly admitted, SNT denies the allegations contained in Paragraph 27.

28.     Denied.

29.     SNT admits that Hawkins traveled to Phoenix for a meeting at CDI's headquarters, and that meeting took place on or about October 2-4, 2005. SNT denies the remaining allegations contained in Paragraph 29.

30.     The allegations contained in Paragraph 30 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

31.     The allegations contained in Paragraph 31 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

32.     The allegations contained in Paragraph 32 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

33.     The allegations contained in Paragraph 33 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

34.     The allegations contained in Paragraph 34 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

35.     The allegations contained in Paragraph 35 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

36.     The allegations contained in Paragraph 36 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

37.     The allegations contained in Paragraph 37 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

38.   Denied.

39.   Upon information and belief, SNT admits that on or about October 5, 2005, Hawkins sent an email to Rausa. Said email is capable of being printed, and therefore can be reduced to writing. Subject to authentication, it speaks for itself as to its contents. To the extent that CDI's allegations concerning said email are out of context, misleading, or otherwise differ from the statements contained in the email and/or to the extent that the email itself contains any incorrect statements, said allegations are denied.  SNT further expressly states that the integration discussed by Hawkins was only of one minor phase.

40.   Denied.

41.   Denied.

42.   SNT has insufficient knowledge or information to form a belief as to the truth of the allegation, "CDI thoroughly tested and re-tested these applications to ensure the stability of the software products prior to sending the executable files to Hawkins," and accordingly denies it. SNT affirmatively states that there were problems with the applications it received from CDI. SNT denies the remaining allegations contained in Paragraph 42.

43.   SNT admits that SNT received literature on CDI's products and a GODIVA PowerPoint CD. Certain other allegations contained in Paragraph 43 concern an email that can be printed, and therefore can be reduced to writing. Subject to authentication, it speaks for itself as to its contents. To the extent that CDI's allegations concerning said email are out of context, misleading, or otherwise differ from the statements contained in the email and/or to the extent that the email itself contains any incorrect statements, said allegations are denied. SNT denies any remaining allegations contained in Paragraph 43.

44.   SNT has insufficient knowledge or information to form a belief as to the truth of the allegation, "Szopinski and Rausa then worked with Tom Dukerich of Hypercom to prepare for

loading onto Hypercom's L4100 device a Demo Script File that was enhanced to incorporate GODIVA's logo and pictures/images," and accordingly denies them. SNT admits that a demo script file was sent on or about November 14, 2005 via Federal Express to SNT. With respect to the allegations concerning emails, said emails are capable of being printed, and therefore can be reduced to writing. Subject to authentication, they speak for themselves as to their contents. To the extent that CDI's allegations concerning said emails are out of context, misleading, or otherwise differ from the statements contained in the emails and/or to the extent that the emails themselves contain any incorrect statements, said allegations are denied. SNT denies any remaining allegations contained in Paragraph 44.

45.    Denied.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied.

51.    SNT admits that on or about February 13, 2006, CDI shipped to SNT a trade show booth and a TeamPOS 2000 terminal. SNT denies that it was shipped for SNT's use. SNT has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 51, and accordingly denies them.

52.    Denied.

53.    SNT admits that certain files and information were sent to Hawkins so he could do work to integrate them and so they would communicate with (not into) each other. Except as expressly admitted, SNT denies the allegations contained in Paragraph 53.

11

54.    SNT has insufficient knowledge or information to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 54, and accordingly denies those allegations. SNT denies the remaining allegations contained in Paragraph 54.

55.    SNT admits that Rausa transmitted to Hawkins certain files, but such admission is not, by implication or otherwise, an admission of CDI's other allegations. Except as expressly admitted, SNT denies the allegations contained in Paragraph 55.

56.    SNT admits that Rausa transmitted to Hawkins certain files, but such admission is not, by implication or otherwise, an admission of CDI's other allegations. Except as expressly admitted, SNT denies the allegations contained in Paragraph 56.

57.    SNT admits that Rausa provided a description of database table fields and provided additional information for a Posting Program. Except as expressly admitted, SNT denies the allegations contained in Paragraph 57.

58.    SNT admits that on or about February 27, 2006, CDI shipped to SNT a Hypercom development unit. SNT has insufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 58, and accordingly denies them.

59.    Denied.

60.    Denied.

61.    Denied.

62.    SNT has insufficient knowledge or information to form a belief as to the truth of the allegations regarding whether Rausa and Szopinski began to redesign, modify, and enhance a Discounting and Promotions Maintenance Tool and, if so, their purpose(s) in doing so, and accordingly denies those allegations. SNT denies the remaining allegations contained in Paragraph 62.

63.     SNT has insufficient knowledge or information to form a belief as to the allegations contained in the first two sentences of Paragraph 63, and accordingly denies said allegations. SNT denies the allegations contained in the third sentence of Paragraph 63.

64.     SNT admits that on April 20, 2006, e-mails were exchanged between CDI and SNT. Said emails are capable of being printed, and therefore can be reduced to writing. Subject to authentication, they speak for themselves as to their contents. To the extent that CDI's allegations concerning said emails are out of context, misleading, or otherwise differ from the statements contained in the emails and/or to the extent that the emails themselves contain any incorrect statements, said allegations are denied. SNT denies the remaining allegations contained in Paragraph 64.

65.     SNT denies that any such acts, if they in fact occurred, were at Hawkins' request. SNT has insufficient knowledge or information to form a belief as to the remaining allegations contained in Paragraph 65, and accordingly denies said allegations.

66.     SNT denies that any such acts, if they in fact occurred, were at Hawkins' request. SNT has insufficient knowledge or information to form a belief as to the remaining allegations contained in Paragraph 66, and accordingly denies said allegations.

67.     Denied.

68.     The allegations contained in Paragraph 68 state legal conclusions to which no response is required. To the extent that there are facts contained in Paragraph 68 that are deemed to require a response, SNT has insufficient knowledge or information to form a belief as to the truth of said allegations, and accordingly denies them.

69.     Denied.

70.     Denied.

71.     Denied.

72.     SNT admits that on or about June 11, 2006, Szopinski and Rausa traveled to North Carolina to meet with SNT. SNT has insufficient knowledge or information to form a belief as to the truth of said allegations regarding the costs of said trip, and accordingly denies said allegation. SNT denies the remaining allegations contained in Paragraph 72.

73.     SNT admits that on or about June 13, 2006, the parties viewed an Infosys PowerPoint presentation and a POS presentation. SNT denies the remaining allegations contained in Paragraph 73.

74.     SNT admits that Lise Romano-Lucero sent via overnight delivery service brochures to Szopinski at SNT. SNT has insufficient knowledge or information to form a belief regarding who requested the brochures be sent and why, and accordingly denies that allegation. SNT denies the remaining allegations contained in Paragraph 74.

75.     Denied.

76.     SNT has insufficient knowledge or information to form a belief as to the truth of the allegations contained Paragraph 76, and accordingly denies those allegations.

77.     SNT has insufficient knowledge or information to form a belief as to the truth of the allegations contained in the first two sentences of Paragraph 77, and accordingly denies them. SNT denies the remaining allegations contained in Paragraph 77.

78.     SNT has insufficient knowledge or information to form a belief as to the truth of what, if anything, CDI shipped to FleetPro Truckwash, and accordingly denies those allegations. SNT denies the remaining allegations contained in Paragraph 78.

79.     The allegations contained in Paragraph 79 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

80.     The allegations contained in Paragraph 80 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations, including all subparts thereto.

81.     SNT incorporates by reference its responses to Paragraphs 1- 80 as if fully set forth herein.

82.     The allegations contained in Paragraph 82 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

83.     The allegations contained in Paragraph 83 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

84.     The allegations contained in Paragraph 84 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

85.     The allegations contained in Paragraph 85 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

86.     The allegations contained in Paragraph 86 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

87.     SNT incorporates by reference its responses to Paragraphs 1 - 86 as if fully set forth herein.

88.     Denied.

89.     The allegations contained in Paragraph 89 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

90.     The allegations contained in Paragraph 90 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

91.     The allegations contained in Paragraph 91 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

92.     The allegations contained in Paragraph 92 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

93.     The allegations contained in Paragraph 93 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

94.     The allegations contained in Paragraph 94 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

95.     The allegations contained in Paragraph 95 state legal conclusions to which no response is required. To the extent that a response is deemed required, SNT denies said allegations.

96.     Except as expressly admitted herein, SNT denies all allegations contained in the Complaint, including all compound allegations and allegations capable of differing

interpretations. Also, no denial should be construed as a tacit admission of any point that CDI attempts to construe in its favor.

### FIRST AFFIRMATIVE DEFENSE
### Failure to State a Claim

CDI's allegations of promissory estoppel fail to state a claim upon which relief can be granted and must be dismissed. CDI failed to plead the claim of promissory estoppel with the requisite specificity under Arizona law. "Although Arizona is a notice pleading state, claims of promises for purposes of promissory estoppel must be specifically pled." Johnson Int'l, Inc. v. City of Phoenix, 192 Ariz. 466, 967 P.2d 607, 615 (1988). Since CDI pled the promise merely as a conclusion (see Compl., ¶ 89), CDI failed to meet Arizona's pleading requirements. Likewise, should the Court apply North Carolina law, as SNT requests, the claim must be dismissed because promissory estoppel does not state a cause of action under North Carolina law.

### SECOND AFFIRMATIVE DEFENSE
### Unilateral or Mutual Mistake

As an alternative defense and without admitting CDI's claims, SNT pleads the doctrines of unilateral mistake or, further in the alternative, mutual mistake in bar of CDI's claims. Assuming *arguendo* that CDI did subjectively believe that the parties were working towards a merger, rather than a new LLC that would be jointly owned by the two separate entities or some other collaboration whereby the parties would retain their individual identities, there was a unilateral mistake of fact by CDI or a mutual mistake of fact by both parties, which bars CDI's claims.

### THIRD AFFIRMATIVE DEFENSE
### Cancellation/Breach by CDI

SNT pleads that CDI, not SNT, canceled the efforts to form a third LLC or joint venture. Also, as an alternative defense without admitting CDI's claims, such claims are again expressly denied, SNT pleads the defense of prior material breach of any agreement, express or implied, by

CDI as a complete bar to recovery by CDI.

### FOURTH AFFIRMATIVE DEFENSE
### No Shareholder Approval

SNT denies that there was an agreement to merge with CDI. Without admitting to such agreement, such again being expressly denied, SNT notes that CDI is claiming that a merger was agreed to by one or more officers of SNT. [Complaint, ¶ 25.] It is the foundation of CDI's attempted claims of promissory estoppel and unjust enrichment. The merger of the two corporations required their respective shareholders to vote to approve it, which did not occur. Any such proposed merger would be tentative and non-binding on both corporations unless and until such time as both corporations' shareholders voted to accept identical terms approving it. Not only did both SNT's and CDI's shareholders never vote to approve the alleged (but denied) merger, but neither SNT's nor CDI's shareholders ever voted on the issue. It is *per se* unreasonable for CDI to believe that such a merger could be accomplished without such votes by both corporations or that anyone associated with a corporation, including a Chairman, CEO, or other top officer, had authority to enter into a binding commitment to merge without formal shareholder approval. Likewise, the unreasonableness of such a contention fails to support the quasi-contractual claims that CDI has attempted.

Moreover, CDI terminated the potential project and, alternatively, CDI has alleged that SNT terminated the alleged (but denied) merger. Therefore, no vote now by CDI, which would be *ex past facto*, would resurrect any such alleged (but denied) merger.

### FIFTH AFFIRMATIVE DEFENSE
### Set-Off

As an alternative defense, SNT pleads the defense of Set-Off to CDI's claims. In the event that CDI is awarded any amount from SNT, the entitlement to which is again expressly denied, SNT is entitled to have the amount of its damages, expenses, lost profits, lost business

18

opportunities, and other losses and costs related to its dealings with CDI, along with the reasonable value of its services, intellectual property, and other benefits conferred by SNT upon CDI off-set against any such award or recovery.

### SIXTH AFFIRMATIVE DEFENSE
#### CDI's Unclean Hands

CDI breached its obligation of good faith and fair dealing that it owed to SNT. Therefore, CDI should be barred from any equitable relief as a result of coming to this Court with unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE
#### Reservation of Rights

SNT reserves and does not waive any additional defenses as may be revealed by information subsequently acquired in discovery or otherwise.

### COUNTERCLAIM AGAINST CDI

Defendant SNT incorporates by reference paragraphs 1 through 96 as if fully set forth herein. Defendant SNT contends that the transaction at issue was one in which both parties were business entities which attempted to do business together, but that attempt failed. Even though CDI misrepresented facts to induce that attempt and ultimately terminated it, each party had agreed to bear its own costs and expenses associated therewith, and no legal action should have been brought by CDI.

As an alternative pleading, SNT brings this Counterclaim, because if any party has been damaged, it was SNT. SNT incurred enormous expense and conferred considerable valuable benefit upon CDI. Again, CDI's principal misled and improperly induced SNT to attempt the venture in the first place, and he improperly terminated it when he unreasonably demanded, and did not receive, an ownership interest in SNT. Under the totality of the circumstances, CDI was unjustly enriched by SNT, and CDI should be ordered to pay damages to SNT. Therefore, SNT,

19

by and through undersigned counsel, for its Counterclaim against the Plaintiff, alleges, states, and avers as follows:

## PARTIES, JURISDICTION AND VENUE

1.      SNT is a corporation organized and existing under the laws of the State of North Carolina and doing business in Wake County, North Carolina. SNT's principal place of business is in Wake County, North Carolina.

2.      Upon information and belief, CDI is a corporation organized and existing under the laws of the State of Arizona and doing business in Maricopa County, Arizona.   Upon information and belief, CDI's principal place of business is in Maricopa County, Arizona.

3.      Jurisdiction and venue of this action are proper in the United States District Court for the District of Arizona under 28 U.S.C. §§ 1332, 1367, 1391, because the Plaintiff, upon information and belief, is an Arizona corporation, which is located and transacts business in Arizona. Also, there is complete diversity of citizenship between the parties and, without admitting Plaintiff's claims, the amount in controversy for the Complaint and the amount in controversy for this Counterclaim each exceeds $75,000.00.

4.      Removal of this action from Arizona State Court to the United States District Court for the District of Arizona was allowed and otherwise proper under 28 U.S.C. § 1441, et seq.

5.      This Counterclaim is pled in the alternative from certain defenses pled by SNT in response to the Complaint, and it is made without admitting or otherwise giving any validity to CDI's asserted claims, such claims by CDI having been expressly denied by SNT.

## GENERAL ALLEGATIONS

6.      Defendant incorporates by reference paragraphs 1 through 5 as if fully set forth herein.

7.     On August 17, 2005, Szopinski of CDI came to SNT with Ed Conklin of Watchhill Technologies ("WHT") and presented a business proposal to SNT.

8.     During the presentation, and as alleged in more detail further below, Szopinski, acting on behalf of CDI, misled SNT into believing that CDI had about 25 employees and several GlobalStore add-in products that were running at several customer locations.

9.     Globalstore is a base POS product from Fujitsu.

10.     Add-in products add to the base product. For example, a car stereo or a tire that is added to a car by a third party would be called an add-in product.

11.     Add-in software/POS products generally are not combined with the base product. Rather, they remain independent components which are accessed by the base product. The source files generally are not given to the base product developer.

12.     At the time of the presentation in August of 2005, SNT had 5 employees.

13.     At that time, SNT had (and still has) Best Buy and Godiva as its customers.

14.     SNT was working with Best Buy and Godiva writing retail applications prior to ever meeting anyone from CDI.

15.     SNT also was developing a new POS product, which would be one of the most feature rich and advanced POS products available.

16.     SNT's founders had earlier worked in Fujitsu and, while at Fujitsu, they had worked in practically every major retailer's POS system, including Kmart, Best Buy, Macy's, Penney's, Sears and many more, as well as some overseas customers. They were (and remain) highly knowledgeable and experienced POS system experts.

17.     SNT has been a profitable company since its inception in 2001.

18.     SNT's 2004 revenue was close to $1.5 million, and its 2005 revenue also was close to $1.5 million.

21

19.     SNT had (and still has) long term contracts with Best Buy.

20.     Even with the strengths mentioned in the previous paragraphs, SNT faced difficulty with marketing its products to other retailers because of its small size.

21.     In the meeting of August 17, 2005, Ed Conklin proposed a consortium which, in theory, would be owned jointly by many partners, including SNT, CDI, WHT, other sales partners and possibly other POS providers.

22.     If such company came to fruition, the plan was that CDI's add-in products would be integrated with the SNT POS and sold by the new company.

23.     In the meeting, SNT fully disclosed that its POS product was in development and was not a completed product at the time. SNT demonstrated the product on a POS register.

24.     CDI represented that: (1) it had a large number of CDI employees (about 25); (2) it had a large customer base; and, (3) its add-in products would complement the product offerings of SNT and would solve the "small company" image of SNT.

25.     Said representations were made during the meeting on August 17, 2005, by Szopinski, as an officer and agent of CDI, and as the act and deed of CDI.

26.     Said allegations were false and calculated to mislead and/or deceive SNT.

27.     Also on behalf of CDI, Szopinski represented that many of CDI's customers were running its GlobalStore add-in products.

28.     That representation was false and calculated to mislead and/or deceive SNT.

29.     A Power-Point presentation was made by CDI to support its claim of the add-in products, which was quite impressive.

30.     PowerPoint presentations can be crafted to make a POS software product look superior, but operating a POS software product over a thousand POS terminals in stores scattered

22

across a continent is exponentially different and more difficult than running a PowerPoint or even a program on one unit.

31.     On the basis of the Szopinski/CDI's representations that CDI had 25 employees, it had several current customers, and its add-in products were then running in several customer systems, SNT moved forward with trying to form the consortium described above, which was a new LLC, and, in particular, with trying to work out the material terms thereof.

32.     On August 31, 2005, SNT sent a document expressing interest and setting forth ideas in attempting to form a new LLC. Such an LLC would be owned jointly by SNT, CDI and WHT in percentages that would need to be determined by mutual agreement.

33.     Under the plan, SNT and CDI would continue to have product ownership of their own respective products and retain their respective corporate identities.

34.     On September 1, 2005, Szopinski on behalf of CDI made comments by email to SNT's proposal in which he accepted the concept of attempting to form a third LLC and in which CDI and SNT would retain their respective corporate identities and products.

35.     During the next several months until CDI terminated the relationship, SNT worked towards integrating the parties' products to develop new products to market through the new LLC.

36.     On September 12, 2005, Szopinski agreed that SNT should promote CDI products at Godiva.

37.     On October 12, 2005, CDI sent a proposed organization chart. It showed a new LLC jointly owned by SNT and CDI. The email mentioned that the proposed organization chart was discussed with CDI's attorney.

38.     On October 2, 2005, Hawkins of SNT visited CDI to learn about their claimed products.

39.     What Hawkins found about CDI's size was different from what Szopinski, acting on behalf of CDI, represented in the August 17, 2005 meeting, which was the basis upon which SNT decided to move forward. Hawkins found that CDI had only two programmers and a receptionist.

40.     During subsequent months, SNT found that:

a.     CDI had laid off one of the programmers, who was the primary programmer for CDI's add-in products;

b.     One programmer, Rausa, was not a permanent resident of the United States;

c.     Compared to SNT's programmers, Rausa did not have extensive experience in the U.S. retail environment;

d.     Upon information and belief, CDI did not have any sales or marketing persons;

e.     Upon information and belief, CDI did not have any GlobalStore customers;

f.     Upon information and belief, CDI did not have any strategic customer contract that would produce future revenue. CDI had some small maintenance contracts on some old products, which are not GlobalStore-based.  Additionally, upon information and belief, CDI had none of the add-in products that it mentioned installed in a retail environment;

g.     Upon information and belief, one programmer was laid off during the next two months;

h.     Upon information and belief, CDI's add-in products were for demonstration purposes and were not installed in any actual retail chain;

i.      The CDI product architecture was not viable, could not be installed for use in a large retailer's POS outlets as it existed, and there were basic flaws that would require a complete change in the architecture; and

j.      CDI's add-in products were developed using an older version of Microsoft.NET base. They needed to be upgraded to the latest version of NET;

41.     Throughout his dealings with SNT, Szopinski, on behalf of CDI, made statements to the officers of SNT concerning the financial and/or material benefit to SNT from doing business with CDI. Upon information and belief, such statements were calculated to induce and keep SNT, through its officers, working with CDI from which CDI gained continued material benefit from SNT's expertise, intellectual property, and other services as alleged below.

42.     SNT never received any benefit from working with CDI.

43.     CDI's programmer spent significant time on correcting "bugs" and making enhancements to CDI's products that were necessary to have CDI's products work in a Tier 1 (large, nationally known) retailer environment.

44.     However, the bugs and flaws with CDI's add-in products also required much work by SNT to correct. SNT undertook the following:

a.      Suggesting "fixes" (corrections) to the CDI architecture;

b.      Training and guiding the remaining CDI programmer in removing or correcting the bugs;

c.      Changing the SNT product to provide workarounds for CDI's product defects; and

d.      Suggesting priorities, which were mostly ignored by Szopinski, which caused more work for SNT and/or inefficient effort by CDI.  For example, SNT asked that CDI's

programmer should not work on the promotion piece, but Szopinski asked the programmer to continue, even though substantive problems remained uncorrected.

45.     SNT's programmers spent an enormous amount of time integrating the CDI products, training and guiding Rausa, the CDI programmer, and making workarounds, as follows:

a.      David Hawkins -1800 hours - Chief Technical Officer, 15 years of experience - valued at $350 per hour;

b.      Zachary Tunstall - 225 hours - 4 years of experience - valued at $265 per hour;

c.      Rathin Devchoudhury - 225 hours - 38 years experience - valued at $350 per hour;

d.      Paul Leung - 337.5 hours - 20 years experience - valued at $350 per hour.

46.     In addition to the integration effort, Gibbs spent 600 hours marketing CDI's products to Godiva and NY&Co. This included phone conversations, travel to New York and Philadelphia, preparing and presenting marketing materials. These hours are valued at $250 per hour.

47.     Also, Rathin Devchoudhury worked 80 hours creating business proposals, which are valued at $350 per hour.

48.     CDI provided false information to SNT starting from the meeting of 8/17/2005.

49.     Based upon this false information, SNT spent 3,187.50 hours in product integration and marketing efforts and travel.

50.     On February 20, 2006, CDI shipped a demo booth to SNT without SNT requesting it. CDI also shipped a POS register and a hand held unit. These are still in SNT's office consuming valuable and costly office space and providing no benefit to SNT.

51.   SNT has never used or derived any benefit from any of the materials that CDI sent to SNT.

52.   On June 15, 2006, Szopinski asked for ownership of a portion of SNT. There was never any agreement to give SNT ownership to him. Rather, as written documents show, the discussions concerned forming a jointly owned new LLC.

53.   When Gibbs did not agree to Szopinski's request, Szopinski stormed out from Gibbs' office at SNT.

54.   After numerous hours by SNT's experienced POS experts and other employees towards making a third LLC or other joint venture work with CDI, and after conferring valuable benefits upon CDI by updating and bringing its software into the 21st Century and otherwise into a more marketable form, Szopinski, on behalf of CDI, terminated the relationship after improperly demanding ownership of SNT because SNT would not agree to that unreasonable demand.

55.   SNT has helped CDI to improve its products to make them more market feasible. CDI's products had little if any value before, because they were practically infeasible and uninstallable over a wide POS network.

56.   Upon information and belief, because of the benefits conferred by SNT upon CDI, but without admitting CDI's claims or estimated value, the value of CDI's products has increased substantially. Upon information and belief, and pleading in the alternative by using CDI's amounts as a basis for determining the benefit conferred by SNT upon CDI, but without admitting CDI's amounts, claims or other allegations, the value conferred upon CDI by SNT was approximately ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00).

57.   The costs to SNT in conferring the benefits upon CDI are as follows:

a.   Hours of work:

27

1.   2785.50 hours of technical work - $ 886,500;

2.   600 hours of marketing and administrative time - $150,000;

3.   80 hours of business planning - $28,000; and,

4.   Total cost of hours worked - $1,064,500.

b.   Travel costs:

1.   Hawkins' travel to CDI - $1,114;

2.   Gibbs' travel to CDI - $1,907;

3.   Gibbs' travel to Godiva - $611;

4.   Gibbs' travel to NY - $1,259 (part of trip devoted to CDI products);

5.   Total travel costs - $4,891

58.   SNT also lost significant revenue and profits from other business because of its dealings with CDI and as a direct result of the wrongful conduct of CDI, for which it should be compensated by CDI. These include, but are not necessarily limited to, additional work with Best Buy, OfficeMax, and/or Godiva between August of 2005 and June of 2006. But for CDI's wrongful conduct, SNT could have installed additional product in a minimum of 300 retail stores, and the license fees for each store would have been $3,000. Therefore, SNT lost at least NINE HUNDRED THOUSAND AND NO/100 DOLLARS ($900,000.00) in such lost opportunities that were directly caused by the wrongful conduct of CDI.

59.   Further, the value conferred upon CDI by SNT for climate controlled storage of the booth, POS, and hand held unit is approximately $900.00 to date, with such amount increasing every day that CDI does not retrieve that property. SNT has provided CDI ample opportunity to retrieve its booth, POS, and hand held unit, but CDI has refused.

60.     The total current amount to which SNT is entitled to recover from CDI is in excess of THREE MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($3,300,000.00), plus interest, attorneys' fees, and costs as alleged further below.

### FIRST CLAIM FOR RELIEF
### Unjust Enrichment

61.     SNT incorporates the allegations of paragraphs 1 through 60 above as if fully set forth herein.

62.     Because of the actions and conduct of CDI and through the excellent work of SNT described above, including, but not limited to, the substantial hours SNT devoted to training and guiding the remaining CDI programmer in removing and/or correcting numerous bugs in CDI's deficient software, otherwise updating CDI's software to make it more up-to-date and useable in the marketplace, providing software to CDI, and other benefits conferred upon CDI by SNT that will be proven at trial, CDI has been unjustly enriched at SNT's expense.

63.     SNT has incurred significant expenses and lost profitable business opportunities because of the conduct and actions of CDI and through the hard work of SNT described above by, among other things, rendering services, intellectual property and expertise to CDI, which have benefited, and continue to benefit, CDI.

64.     SNT conferred the above-referenced benefits upon CDI under circumstances that would render inequitable CDI's retention of the benefits without payment by CDI to SNT for those benefits.

65.     As a result of CDI's improper actions, SNT should be compensated for its resulting damages and losses, which currently are in excess of THREE MILLION THREE HUNDRED THOUSAND AND N0/100 DOLLARS ($3,300,000.00).

66.     SNT is entitled to damages in an amount to be proven at trial, which SNT currently alleges are in excess of THREE MILLION THREE HUNDRED THOUSAND AND N0/100 DOLLARS ($3,300,000.00), including, but not necessarily limited to, quantum meruit damages.

67.     SNT is also entitled to recover its costs and attorneys' fees to the extent allowed by North Carolina law or, alternatively, pursuant to A.R.S. §§ 12-341 and 12341.01 (respectively), or as otherwise may be allowed by law.

## SECOND CLAIM FOR RELIEF
### Bailment

68.     SNT incorporates the allegations of paragraphs 1 through 67 above as if fully set forth herein.

69.     In February of 2006, CDI delivered, and SNT accepted for storage for CDI, CDI's demo booth, POS register, and hand held unit (hereinafter the "Property").

70.     Since February of 2006, SNT has stored, in SNT's possession, the Property for CDI in SNT's climate controlled office in Wake Forest, Wake County, North Carolina.

71.     SNT has stored the Property in a climate controlled environment under its protection and exclusive possession and control from all others except for CDI.

72.     The Property consumes valuable office space belonging to SNT.

73.     SNT has demanded that CDI retrieve the Property or else storage charges for climate controlled storage would accrue, but CDI has refused to retrieve the Property.

74.     CDI and SNT have entered into a bailment with respect to the Property stored by SNT for CDI, whereby SNT is the bailee and CDI is the bailor of the Property.

75.     Alternatively, an implied bailment or other bailment by operation of law has arisen, whereby SNT is the bailee and CDI is the bailor of the Property.

76.     SNT is obligated to return CDI's Property, and is ready, willing, and able to return it to CDI at SNT's Wake Forest, Wake County, North Carolina office at which SNT is storing the Property or to otherwise deliver it to CDI at CDI's risk and expense.

77.     SNT is entitled to recover a reasonable amount from CDI for climate controlled storage of the Property based upon prevailing or otherwise reasonable market rates for climate controlled storage in Wake Forest, Wake County, North Carolina.

78.     To date, SNT is entitled to recover NINE HUNDRED and NO/100 DOLLARS ($900.00) from CDI for storage of the Property, plus a reasonable amount per day until such time as CDI retrieves its Property.

WHEREFORE, SNT requests that this Court enter judgment in its favor and against CDI as follows:

A.     Dismiss CDI's Complaint with prejudice, such that CDI has and recovers nothing;

B.     Award SNT damages in an amount to be proven at trial, including, but not limited to, quantum meruit, compensatory, direct, incidental, and consequential damages;

C.     Award SNT prejudgment and post judgment interest as permitted by law;

D.     Award SNT its costs and attorneys' fees to the extent allowed by North Carolina law or, in the alternative, pursuant to A.R.S. §§ 12-341 and 12-341.01 (respectively), or as otherwise allowed by law;

E.     For a trial by jury on all issues properly triable thereby; and,

F.     For such other and further relief as the Court deems just and proper.

DATED this _____day of December, 2006.

. . .

. . .

31

1

2

BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.

3

4

BY _____

William G. Fairbourn

5

Meredith L. Vivona

6

2901 N. Central Avenue – Suite 1000
Phoenix,  AZ  85012

7

8

AND

9

WYRICK ROBBINS YATES
& PONTON, LLP

10

11

BY _____

John R. Green, Jr.

12

Joseph H. Nanney, Jr.

13

4101 Lake Boone Trail
Raleigh,  NC  27607

14

*Attorneys for DEFENDANT*

15

16

**ORIGINAL** of the foregoing electronically
filed this _4th_ day of December, 2006, with

17

18

Clerk of District Court
DISTRICT OF ARIZONA

19

401 W. Washington
Phoenix,  AZ  85003

20

21

**COPY** of the foregoing e-mailed this
_4th_ day of December, 2006, to

22

23

Honorable H. Russel Holland
Holland_chambers@akd.uscourt.gov

24

. . .

25

. . .

26

27

. . .

28

32

1  **COPY** of the foregoing mailed this
2  4th day of December, 2006, to:

3  Ed Hendricks, Sr.,
   Amanda D. Crutchfield,
4  MEYER HENDRICKS, P.L.L.C.
5  3131 East Camelback Road, Suite 310
   Phoenix,  AZ  85016
6  *Attorneys for PLAINTIFF*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

33